## HUME v. FRENZ et al.

(Circuit Court of Appeals, Ninth Circuit. February 4, 1907.)

No. 1,318.

1. ADMIRALTY—APPEAL—ISSUES REVIEWABLE.

In a suit for wages by the master of a vessel against the owner and insurers, the only controversy was as to the ownership of the vessel during the time libelant's services were rendered; the owner claiming to have abandoned her to the insurers, and the insurers denying such abandonment. The court dismissed the libel as to the insurers and entered a decree in favor of libelant against the owner, who alone appealed. *Held,* that he was entitled to maintain such appeal and to a review of the decision as between himself and his co-respondents.

2. INSURANCE—MARINE INSURANCE—EVIDENCE OF ACCEPTANCE OF ABANDONMENT.

The action of the insurers of a stranded vessel in sending an agent to take charge, and to salve her, if possible, cannot be construed against them, on the question whether or not they accepted an abandonment, where it was expressly agreed between them and the owners that such agent should go as the representative of all parties in interest.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 28, Insurance, § 1216.]

3. SAME.

The insurers of a stranded schooner, under policies which provided that no acts in recovering, saving, and preserving the property insured, in case of disaster, should be considered a waiver or an acceptance of an abandonment, sent an agent to take charge of the vessel, under an agreement with the owner that he should represent all interests. By direction of the insurers, in which the owner refused to take part, the agent contracted for the salving of the vessel, and after her release the insurers had her temporarily repaired, and she loaded a cargo and carried the same to San Francisco; her master having remained with her at request of the agent in charge. The owner refused to give any direction respecting her employment, and on her arrival in San Francisco refused to receive her or accept her freight, claiming that she had been abandoned to the insurers, which they at all times denied. They afterward had her permanently repaired, but permitted her to be sold for the cost of such repairs. This was five months or more after the stranding. *Held,* that their action, in retaining possession for such length of time without permanently repairing, and in finally permitting the vessel to be sold, was not authorized by such clause of the policies, and under the circumstances amounted to a constructive acceptance of the abandonment, whether or not the owner originally had the right to abandon.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 28, Insurance, § 1216.]

4. SAME—STRANDING OF VESSEL—LIABILITY FOR SUBSEQUENT WAGES OF MASTER.

The master of a stranded vessel, who remains with her, does so as the agent of whoever may be ultimately determined to be her owner in consequence of that event, and, where an abandonment is subsequently accepted by the insurers, although it may be months afterward, it relates back to the date of the stranding, and the master is from that time their agent, for whose wages they are responsible.

Appeal from the District Court of the United States for the Northern District of California.

For opinion below, see 141 Fed. 481.

Frank & Mansfield, for appellant.

Charles W. Slack, Louis T. Hengstler, and H. W. Hutton, for appellees.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

ROSS, Circuit Judge. This was a libel, brought by one Herman Frenz, as master of the American schooner Del Norte, against the appellant, Hume, as owner of the schooner, and against the appellee insurance companies, insurers of the vessel, to recover his wages for a period of something over five months succeeding the stranding of the vessel on the 11th day of June, 1904. The libelant alleged in his libel that during the period mentioned the defendants thereto were the owners and operators of the schooner, and that he performed services as master thereof at their request. Each of the three defendant insurance companies answered separately, denying that it was the owner or operator of the vessel, and denying that the libelant at any time performed services for it, or at its request. And the other defendant, Hume, made like denials of the averments of the libel.

The case shows that Hume, as owner of the schooner, had procured to be issued by the insurance companies mentioned policies of insurance covering the vessel, and had employed the libelant Frenz as her master to perform certain voyages between the port of San Francisco and Siuslaw, on the coast of Oregon. On her second trip to Siuslaw river, and while laden with cargo for San Francisco, the schooner was, on the 11th day of June, 1904, stranded on a sand spit at the mouth of that river. The insurance companies, being notified of that fact, sent an agent to the vessel for the purpose of rescuing and repairing her, which agent, on his arrival, discharged the crew, and, within a few days thereafter, discharged the mate, retaining the master of the schooner only. The vessel was taken from the sand spit and partly repaired, then reladen with cargo, and brought to San Francisco by her master. Both Hume and the underwriters deny that the master did so by virtue of any authority from them, and both refused upon the arrival of the schooner at San Francisco to receive the freight money or in any wise to become responsible for the charges and expenses. The master thereupon received the freight money from the consignee, and expended it in paying the crew and other expenses incident to that voyage. The schooner not having been fully repaired at Siuslaw river, the insurance companies ordered her into the dry dock at San Francisco, and made further repairs of damage incurred in the stranding, for which expenses they permitted the vessel to be libeled and sold. The period for which the libelant's wages are demanded commences at the time the insurance companies sent their representative to the vessel, and ends at the time of the further repairs made at San Francisco.

In the course of the trial in the court below, these proceedings occurred:

"The Court: Is there any dispute about the fact that somebody owes this libelant for all that he claims? That is not disputed?

"Mr. Frank (for the defendant Hume, appellant here): Not so far as we are concerned.

"Mr. Hengstler (for the insurance companies, appellees here): Not so far as we are concerned.

"The Court: Who owes it depends on the question who owns the vessel, is that it?

"Mr. Hengstler: Yes."

The real controversy between the parties in the court below was, as is indicated by the above extract from the record, whether Hume or the insurance companies should pay the libelant the amount of wages to which he was admittedly entitled; the contention of Hume, the appellant here, being that the insurance companies took possession of the vessel when stranded, to rescue and repair her, and, having failed to return her to the owner free of liens incurred in such repairs, are to be deemed to have accepted the abandonment of the vessel which it is claimed by the appellant he made, and are therefore to be treated as the owners of the schooner from the time they took possession of her.

On the other hand, it is contended on the part of the insurance companies, the appellees here, that Hume never did abandon the vessel, and never had any right to do so, and that they did not employ the libelant as master, or otherwise, and had nothing to do with the voyage from Siuslaw river to San Francisco, or with the earnings of the vessel on that voyage.

The court below dismissed the libel as to the insurance companies, and gave the libelant judgment against Hume, who brought the present appeal, the libelant not having appealed; upon which ground the appellees insurance companies have moved for a dismissal of the appeal, contending that Hume has no appealable interest against them. This suggestion proceeds upon the theory that the record presents no controversy between the appellant and the appellees. But the fact is, as shown by the quotation we have made from the record, that the only controversy in the court below was between Hume and the insurance companies as to which was liable for the wages that were admittedly due the libelant. The decision of that question by the court below was against Hume and in favor of the insurance companies, which controversy is presented anew in this court by the appeal, which the defeated party in the court below had the clear right to take. The motion to dismiss the appeal is denied.

A. H. Herriman was the man sent by the insurance companies to the stranded vessel. On the trial in the court below, the proctor for the appellees, in answer to a question by the court, stated that "he was the agent for the insurance companies, but went up there for all concerned." The consent of Hume to the sending by the insurance companies of Herriman is evidenced by this letter, introduced on the trial in the court below by the appellees:

"San Francisco, Cal., June 15, 1904.

"Mr. C. J. Stovel, Representing the Underwriters on the Hull of the Schooner Del Norte, 122 Sansome St., City—Dear Sir: Confirming our conversation with your Mr. Miall this morning, we hereby consent to have Capt. A. H. Herriman, acting as representative of all interests concerned, proceed to Siuslaw river for the purpose of reporting on the schooner Del Norte (ashore on the south spit) and of conducting salvage operations if deemed advisable.

"Yours truly,                                    R. D. Hume & Company."

The testimony shows that this letter was written by Herbert Hume, a partner of R. D. Hume; the latter being at the time in the state of

Oregon. In respect to both the statement of the proctor for the appellees as well as the letter above quoted, it should be said that an act done for the benefit of the property, to whomsoever it may belong, ought not to be construed against the party who thus seeks the common interest. 2 Phil. Ins. § 1692.

The undisputed evidence shows that Herriman reached the stranded vessel on the 18th of June, 1904, discharged the crew, retained the master, and the mate also for a few days, when the latter, too, was discharged by Herriman, who proceeded to procure the vessel to be hauled off the spit and to be partially repaired. The testimony of the master is to the effect that when Herriman retained him and the mate he told him that their wages would be paid by the insurance companies. In his deposition Herriman denies that he told the master anything of the sort. The appellant, Hume, testifies in effect that, in a conversation he had on the 21st of June, 1904, with the representative of the insurance companies, Mr. Miall, he told Miall that as the companies had taken possession of the vessel he would have nothing more to do with it; that they had her and could take care of her.

Miall's testimony in respect to this conversation is as follows:

"Q. Now, just give us this conversation as near as you can remember it. A. I called on Mr. Hume and referred to the incidents that had occurred during his absence and the conversation I had with Mr. Herbert Hume, and I asked him if he approved of it, and if he had got any suggestions or advice, because he was the owner of the vessel, and he also had had a great deal of experience in things like this. Mr. Hume told me he had no suggestions whatever to make. He told me that he was not going to interfere in any way.

"Q. Did he tell you that he abandoned the vessel to you, or anything tantamount to that? A. No, sir; he did not.

"Q. He did not? A. No, sir."

This witness further testified that he communicated this conversation to the insurance companies.

On the same day the insurance company wrote Hume as follows:

"San Francisco, Cal., June 21, 1904.

"Messrs. R. D. Hume & Co., City—Dear Sirs: We beg to submit for your approval the following telegram, which the underwriters on the hull of the schooner Del Norte propose sending to Capt. Herriman at Siuslaw River, Oregon. Kindly signify your consent to the proposed plan as indicated in the telegram:

"'Capt. A. H. Herriman, c/o Wm. Kyle & Sons, Florence, Main Co., Ore.

"'You may contract to salve Del Norte for five hundred no, cure no pay with time limit of ten days or shortest possible limit within your discretion. You remain to watch operations. C. J. Stovel.'

"Yours very truly,                                          C. J. Stovel, Mgr."

"San Francisco, Cal., June 21, 1904.

"Messrs. R. D. Hume & Co., City—Dear Sirs: Since your conversation with our Mr. Miall this morning, we have consulted the other underwriters interested on the hull of the schooner Del Norte, and find that, in their opinion, the plan proposed by them is the most advisable course to pursue under the circumstances. We therefore again request your concurrence with the terms of our former letter of this date. We must further advise you that, should you fail to comply with the provisions of the clause marked No. 7 in the policy issued to you by the British-America Assurance Company, the underwriters, in the event of the schooner being salved through their efforts, will charge you

salvage for their work in saving the vessel. Hoping, however, that you will see your way to reconsidering your position, we are,

"Yours very truly,                                        O. J. Stovel, Mgr."

Hume testified that when he received this letter he again informed the insurance companies that he had nothing to do with the matter, and in his testimony gave as a reason for his position the following:

"I was satisfied, from the length of time that the vessel had been stranded and on the bar, being wrenched and twisted out of shape, she was not worth attempting to save, and, from the conditions existing previous to that time between the insurance companies and Capt. Herriman and myself, I considered he was a very bad agent, for me, to go up there and try and preserve any portion of that vessel."

The record, however, also shows that at various times after Herriman had taken charge of the vessel, and before she left Siuslaw river on her return trip to San Francisco, the master gave Hume information concerning the vessel and asked for instructions concerning her. This is shown by the following letter, telegram, and telephone messages:

"San Francisco, June 22, 1904.

"Capt. Herman Frenz, Florence, Lane Co., Or.—Dear Sir: Your favor of 17th to hand, and I am pleased to learn that the Del Norte is not greatly injured. As a representative of the insurance companies is there, and as you are the master of the vessel, you are agent for all concerned, so I depend on you to see that the operations are conducted with as much economy as is possible. At this distance I am unable to judge of the conditions existing, and must depend on your good judgment to bring back the vessel with as little expense incurred as is possible. I should think that the tug would be liable for putting you ashore, but I see that a large bill is built up against the vessel by the tug owners. You will do the best you can, which is all that any one can do.        Yours,                           R. D. Hume."

Telephone Message.

"San Francisco, Sept. 2, 1904.

"R. D. Hume, Wedderburn, Oregon: Del Norte is now repaired and at Siuslaw awaiting orders. Shall I instruct Captain to load and proceed to San Francisco.                                        H. Hume."

Telephone Message.

"Wedderburn, Oregon, Sept. 2, 1904.

"Herbert Hume, San Francisco: Don't meddle. The Captain will act for all parties.                                        R. D. Hume."

Telegram.

"Florence, Or., Via Eugene, Or., Sept. 12, 1904.

"R. D. Hume, San Francisco: Load offered from Hurd for San Francisco at five dollars, am waiting for your consent.

"Herman Frenz, Master Del Norte."

Telephone Message.

"San Francisco, Sept. 13, 1904.

"R. D. Hume, Wedderburn, Oregon: Following is a telegram received to-day from Capt. Frenz of Sch. Del Norte: 'Load offered from Hurd for San Francisco at five dollars, am waiting for your consent.'        H. Hume."

Telephone Message.

"Wedderburn, Oregon, Sept. 14, 1904.

"Herbert Hume, San Francisco: Wire Frenz to act best for all concerned. We have no orders to give.                           R. D. Hume."

On the 29th of October, 1904, Hume wrote the insurance companies this letter:

"421 Market Street, San Francisco, Oct. 29, 1904.

"To the British America Assurance Co., St. Paul Fire & Marine Insurance Co., Canton Insurance Office, Limited, San Francisco, Cal.

"Gentlemen: In reply to your communication of the 27th inst., we would say that you are mistaken in regard to the question of abandonment. While we have heretofore not served you with written notice, we have done so verbally, and now here declare that we have and do abandon the said schooner Del Norte. We would also suggest that no acceptance by the said captain is binding upon us, he being agent for all concerned, and that he has not been under any orders from us since the insurers took possession of the vessel. We would also say that the vessel was not in a seaworthy condition when left in charge of the captain at Siuslaw, and arrived at San Francisco practically a wreck, and is not now, nor has been in a seaworthy condition since her being stranded. We hereby give you notice that we shall pay no bills contracted by you, and desire that you shall as expeditiously as possible pay us the amount for which we were insured viz., three thousand dollars ($3,000.00). By so doing you will save us trouble and your own reputation.

"Yours respectfully, R. D. Hume & Co."

In reply the insurance companies wrote as follows:

"San Francisco, Cal., Nov. 1, 1904.

"Messrs. R. D. Hume and Co., 421 Market Street, City—Dear Sirs: We beg to acknowledge your communication of the 29th ult., regarding the schooner Del Norte. In reply we beg to advise you that we do not accept your notice of abandonment, and that we cannot agree with your remarks respecting the seaworthiness of the vessel.

"Yours truly, British America Assurance Co.,
"C. J. Stovel, Mgr.
"Canton Insurance Office, L'd.,
"J. J. Theobald, Mgr.
"St. Paul Fire & Marine Ins. Co.,
"M. C. Harrison, Mgr."

In respect to the sending of Herriman, we find in the letters written on behalf of the insurance companies to him these, among other, instructions, under date as follows:

"June 22, 1904: We are in receipt of your telegram of the 20th inst., reading as follows: 'Del Norte full of water on south spit tide ebbing and flooding into her badly strained to float must discharge cargo and use barrels can be repaired here Hurds tow-boat and Life Saving crew have bill for six hundred dollars for services rendered have stopped all expenses awaiting your instructions crew all left except captain and mate can contract to float and beach here for five hundred dollars or sell as she now stands for one thousand dollars wire immediately as conditions of bar are liable to change cannot estimate repairs as bottom cannot be seen'—for which please accept our thanks. In reply we telegraphed you as follows: 'You may contract to salve Del Note for five hundred no cure no pay with time limit of ten days or shortest possible limit within your discretion. You remain to watch operations'—which we beg to confirm. Shortly after the despatch of this message we received your second wire, reading as follows: 'If delay longer ship and cargo will be total loss have made contract Hurds towboat people to float and put on beach safe place at Florence and discharge cargo five hundred dollars, no pay if contract is not carried out. Letter received this a. m.' We are well satisfied to find that you have interpreted our wishes before the receipt of our reply, but hope that in your contract with the Hurd Towboat Company you inserted a time limit for the fulfillment of the contract. The underwriters do not feel that the contractor should be allowed unlimited time in which to float the ves-

sel, the more especially as your own expenses would amount to a considerable sum, if the floating of the vessel was long delayed."

"June 22, 1904: You will further be very careful not to permit the cargo to be taken out of your possession until authorized by the companies that you represent. You may take any legal steps that may be necessary to enforce the matter, but under no circumstances are you to permit the cargo to be turned over to Mr. Hurd or anybody else."

"July 13, 1904: On receipt of your survey we will act as promptly as possible, and in the meanwhile we ask you to take care that we do not lose possession of the vessel, and that the question of the cargo is settled up in accordance with the first part of this communication. We are taking this action in regard to repairs on the vessel, owing to your statement that you are unable to obtain carpenters or calkers. Your efforts on our behalf are appreciated by the underwriters, and we all look forward to the matter being brought to a successful ending."

"August 9, 1904: It is not necessary for you to advise us of all the small details of the troubles you are experiencing, as we have placed this matter in your hands for attention. We are in communication with Mr. Hume on the subject of the keels, sternpost, and shoe, and will advise you at the earliest possible hour. In repairing the vessel, you will, of course, take detailed memoranda of all the repairs effected, and will be in position to show the adjuster which items are chargeable to the owners, and which items the underwriters are to pay for. In reply to your various statements in question, we can only ask you to use your discretion, and hasten the work as fast as possible. We appreciate the difficulties under which you have worked, and hope you will succeed in finishing up the job without much more delay. The loading of the vessel is a matter that concerns Mr. Hume more than anybody else. As soon as you report to us that she is in condition to receive cargo, we will advise him of the fact. If the captain is still at Florence, you will, of course, refer any such matters as these to him, and will take no action outside of your own province."

Enough has been inserted from the record to show that, while the insurance companies had taken possession of the vessel, and were directing the operations, they seemed still to regard Hume as the owner, and that, while the master and Hume were communicating with each other, and the master was asking of Hume orders, he refused to give any instructions, contending that the whole matter was in charge of the insurance companies. But the fact which, in our opinion, must control the disposition of the case, is that, according to the evidence, the repairs made by the insurance companies were but temporary and partial, and did not amount to an indemnity to the insured, being but a small part of the insurance, and that on the return of the vessel to San Francisco in a disabled condition the insurance companies ordered permanent repairs upon her, for the payment of which they permitted the vessel to be sold.

The law upon the subject is thus stated by the Supreme Court in the case of Insurance Company v. Copelin, 76 U. S. 461, 465, 19 L. Ed. 739:

"The defendants complain, however, that they have been held liable as for a constructive loss, when there was no right to abandon, and when the abandonment of which the plaintiff gave notice was not accepted. Doubtless, had the defendants taken possession of the boat, as they were authorized to do, by the provisions of the policy, and had they raised, completely repaired, and returned her to the plaintiff in a reasonable time, they could not have been held liable for a total loss. It is an established fact that there was no right to abandon when they did take possession of the vessel. And it was expressly

stipulated in the policy that the acts of the assured, or insurers, or of their joint or respective agents, in preserving, securing, or saving the property insured, in case of danger, or disaster, should not be considered, or held to be, a waiver or acceptance of an abandonment. It is well settled, however, that an offered abandonment may be accepted, even when the assured has no right to abandon, and, if accepted, it must be with its consequences. And an acceptance need not be expressly made. It may even be refused, and yet the insurers, by their conduct, may make themselves liable as for a total loss. Though, by the terms of the policy, these defendants had a right to take possession of the boat, and repair her for account of the plaintiff, yet this was a privilege accorded to them only that they might thus make indemnity for the loss. Taking possession to make partial repairs, not amounting to indemnity, was not contemplated by the contract. It was not authorized. Nor did the contract warrant taking possession of the boat and holding her for an unreasonable time. The insurers were bound to repair and return without unnecessary delay. In holding longer than was necessary for making repairs, they must be regarded as acting, not as insurers, but as owners, for they had no other authority than that of owners for their failure to return within a reasonable time. Their action was therefore a substantial recognition and acceptance of the abandonment of which they had been notified, for in no other way had they become owners. On no other theory can this delay be considered lawful. It is true the policy stipulated that the acts of the insurers in preserving, securing, or saving the property insured, in case of danger or disaster, should not be considered or held an acceptance of abandonment; but this manifestly refers only to authorized acts. Retaining possession of the boat an unreasonable time, and then offering to return her unrepaired, were not authorized acts, and consequently they are unaffected by the stipulation. They must therefore be regarded as constructive acceptance of an abandonment.

"This is a principle asserted and well sustained by the authorities. In Peele v. Suffolk Insurance Company, 7 Pick. (Mass.) 254, 19 Am. Dec. 286, where the jury had found that the underwriters, who had taken possession of the stranded vessel, had not offered to restore her in a reasonable time, the court said: 'The underwriter has his duties as well as his rights. If he take the vessel into his possession to repair her, he must do it as expeditiously as possible, in order that the voyage, if not completed, may not be destroyed. If he delay the repairs beyond a reasonable time, he forfeits his right to return the ship, and must be considered as taking her to himself under the offer to abandon.' The principle, said the court, rests upon the very nature of the law of insurance, which is a fair and honest indemnity for loss. The same doctrine was asserted in Reynolds v. Ocean Insurance Company, 1 Metc. (Mass.) 160, and it was also held that the underwriter's duty and liability in such a case are not varied by a clause in the policy of insurance, stipulating 'that the acts of the assurers, in recovering, saving, and preserving the property insured in case of disaster, shall not be considered an acceptance of an abandonment.' Such also was the rule in a case between the same parties (22 Pick. [Mass.] 191, 33 Am. Dec. 727), and in Norton v. Lexington Fire, Life & Marine Insurance Company, 16 Ill. 235. It is in our judgment sustained by sound reason.

"The plaintiffs in error, however, insist that the doctrine cannot be applied to the present case, because the court below found there was no right, under the facts shown on the part of the plaintiff, to abandon for a total loss, although he gave notice that he did so abandon, and that there was no acceptance by the insurers of such an abandonment. But this must be considered in connection with the other facts found. It is equally a fact in the case that the defendants took possession of the boat, repaired her very insufficiently, and, after having held her an unreasonable time, offered to return her. The legal effect of this we have seen. Taking these facts together, the finding that the defendants did not accept the abandonment which the plaintiff offered, at a time when he had no right to abandon, means no more than that there was no express or avowed acceptance. This is quite consistent with the judgment that, by their failure to return the boat within a reasonable time, they made themselves liable to pay the full amount of the policy."

The policies here involved contain the clause:

"Nor shall the acts of the insured or insurers in recovering, saving and preserving the property insured, in case of disaster, be considered a waiver or an acceptance of an abandonment."

This, as held by the Supreme Court in the case just cited, "manifestly refers only to authorized acts. * * * Taking possession to make partial repairs, not amounting to indemnity, was not contemplated by the contract. It was not authorized."

We are of the opinion that the acts of the insurance companies in question, in view of all of the circumstances of the case, must be regarded as a constructive acceptance of an abandonment. Insurance Company v. Copelin, supra; Gilchrist v. Chicago Insurance Company, 104 Fed. 566, 44 C. C. A. 43; The Sarah Ann, 2 Sumn. 206, 210, Fed. Cas. No. 12,342, where Mr. Justice Story said:

"When a loss takes place for which an abandonment may be made, the master is not exclusively the agent of the original owners of the ship, but he is the agent of those who retroactively become owners of the ship in consequence of that event. If an abandonment is made and is justifiable, the common doctrine is that the master is the agent of all concerned in the voyage, and that he becomes, by relation, the agent of the underwriters, whenever an abandonment has been accepted, from the time of the loss to which the abandonment refers, although the abandonment may not have been offered or accepted until months after the event."

We are of the opinion that the judgment should have been given against the insurance companies, instead of the appellant.

Accordingly, the judgment is reversed, and the cause remanded, with directions to the court below to enter judgment for the libelant against the defendant insurance companies for the full amount of the libelant's wages from June 18, 1904, to January 12, 1905, with costs.